# Juvenile Law Center

www.JLC.org • **Advancing the rights and well-being of children in jeopardy** • Founded 1975
The Philadelphia Building • 1315 Walnut Street, 4th Floor • Philadelphia, PA 19107 • (215) 625-0551 • FAX: (215) 625-2808 • in PA: (800) 875-8887

April 8, 2003

Mary E. D'Andrea
Clerk of Court
United States District Court
Middle District of Pennsylvania
William J. Nealon Federal Building & U.S. Courthouse
235 N. Washington Ave., P.O. Box 1148
Scranton, PA 18501

BY FIRST CLASS MAIL

RE:   **A.M. v. Luzerne County Juvenile Detention Center et al.**
**Civil Action No. 3:CV-01-1276      (Judge Caputo)**

**Outstanding Exhibit to Schedule of Exhibits in Support of
Plaintiff's Brief in Opposition to Motion for Summary Judgment of Defendants
Luzerne County Juvenile Detention Center, Brulo, Kwarcinski, Prawdzik, Traver,
Parker, Considine and Yozviak (Docket # 82). Plaintiff's Brief in Opposition to
Defendant Puffenberger's Motion for Summary Judgment (Docket # 80), and
Plaintiff's Responses to Defendants' Statements of Undisputed Material Facts
Pursuant to Local Rule 56.1**

To the Clerk of Court:

Please find enclosed for filing in the above-captioned matter Exhibit #61 (Deposition of
Jerome Prawdzik dated 8/20/02) to the Schedule of Exhibits in Support of the above-named
documents. We mistakenly forgot to include this exhibit with those that we mailed to you
yesterday. (See attached letter to you dated April 7, 2003.)

If you have any questions, please contact attorney Rosado at 215-625-0551. Thank you
for your attention to this matter.

**STAFF:**
Robert G. Schwartz, Esq.
Marsha L. Levick, Esq.
Laval S. Miller-Wilson, Esq.
Lourdes M. Rosado, Esq.
Jennifer Pokempner, Esq.
Suzanne M. Meiners, Esq.
Alisa G. Field, Esq.
Holly L. Merna
Nakeeb Siddique
Cassandra Snyder
Debbie A. Hollimon-Williams
Joann Viola

**BOARD OF DIRECTORS:**
Vernon L. Francis, Esq.
  *President*
Richard D. Holder
  *Vice President*
Clifford Pearlman
  *Treasurer*
Hon. John L. Braxton
  *Secretary*

Peter B. Edelman, Esq.
Andrea Floyd, Esq.
Frank F. Furstenberg, Jr.
Eric S. Koenig, Esq.
Charisse R. Lillie, Esq.
Carrolle Perry Devonish
Joe Quinlan
Donald Schwarz, M.D.
Daniel Segal, Esq.

Mark I. Soler, Esq.
Eileen Tyrala, M.D.
Juan Williams
Barry L. Zubrow

*Directors Emeritus*
Stuart W. Kline
Sol E. Zubrow
(1976-1993)

Sincerely,

Marsha Levick, Esq.
Lourdes Rosado, Esq.
ATTORNEYS FOR PLAINTIFF

Attachment
Enclosure

2

# Juvenile Law Center

www.JLC.org • **Advancing the rights and well-being of children in jeopardy** • Founded 1975

The Philadelphia Building • 1315 Walnut Street, 4th Floor • Philadelphia, PA 19107 • (215) 625-0551 • FAX: (215) 625-2808 • in PA: (800) 875-8887

April 7, 2003

Mary E. D'Andrea
Clerk of Court
United States District Court
Middle District of Pennsylvania
William J. Nealon Federal Building & U.S. Courthouse
235 N. Washington Ave., P.O. Box 1148
Scranton, PA 18501

BY UPS OVERNIGHT MAIL

RE:   **A.M. v. Luzerne County Juvenile Detention Center et al.**
      **Civil Action No. 3:CV-01-1276      (Judge Caputo)**

Outstanding Exhibits to Schedule of Exhibits in Support of
Plaintiff's Brief in Opposition to Motion for Summary Judgment of Defendants
Luzerne County Juvenile Detention Center, Brulo, Kwarcinski, Prawdzik, Traver,
Parker, Considine and Yozviak (Docket # 82).  Plaintiff's Brief in Opposition to
Defendant Puffenberger's Motion for Summary Judgment (Docket # 80), and
Plaintiff's Responses to Defendants' Statements of Undisputed Material Facts
Pursuant to Local Rule 56.1   (Docket #s 81 and 83)

To the Clerk of Court:

Please find enclosed for filing **under seal** in the above-captioned matter Exhibit #55
(Detention Center Morning Report dated 7/28/99) to Schedule of Exhibits in Support of the
above-named documents, which were filed today electronically.

Please also find enclosed the following exhibits, which we attempted to file
electronically, but were not able to do so. (With respect to Exhibit #39, we received a message

**STAFF:**
Robert G. Schwartz, Esq.
Marsha L. Levick, Esq.
Laval S. Miller-Wilson, Esq.
Lourdes M. Rosado, Esq.
Jennifer Pokempner, Esq.
Suzanne M. Meiners, Esq.
Ailsa G. Field, Esq.
Holly L. Merna
Nakeeb Siddique
Cassandra Snyder
Debbie A. Holliman-Williams
Joann Viola

**BOARD OF DIRECTORS:**

Vernon L. Francis, Esq.
   *President*
Richard D. Holder
   *Vice President*
Clifford Pearlman
   *Treasurer*
Hon. John L. Braxton
   *Secretary*

Peter B. Edelman, Esq.
Andrea Floyd, Esq.
Frank F. Furstenberg, Jr.
Eric S. Koenig, Esq.
Charisse R. Lillie, Esq.
Carrolle Perry Devonish
Joe Quinlan
Donald Schwarz, M.D.
Daniel Segal, Esq.

Mark I. Soler, Esq.
Eileen Tyrala, M.D.
Juan Williams
Barry L. Zubrow

*Directors Emeritus*
Stuart W. Kline
Sol E. Zubrow
(1976-1993)

that the file was corrupt. With respect to the other exhibits, the system shut us out, perhaps because the files were too long.)

**Ex. #**   **Description**

39.   Plaintiff's Letter to Defendants' Counsel dated 06/11/02

56.   Excerpts from First Deposition of Sandra Brulo, dated 7/31/02

58.   Excerpts from First Deposition of Louis Kwarcinski, dated 7/30/02

61.   Excerpts from Deposition of Jerome Prawdzik, dated 8/20/02

66.   Excerpts from Deposition of Mark Puffenberger, M.D., dated 11/19/02

67.   Excerpts from First Deposition of Elaine Yozviak, dated 2/14/03

70.   Excerpts from Deposition of John DeAngelo, dated 9/24/02

71.   Excerpts from Deposition of Greg Kahn, dated 9/24/02

72.   Excerpts from Deposition of K.K. (Plaintiff's stepfather), dated 5/15/02

73.   Incident Report by Hutchins dated 8/9/99 (previously marked P-39 in depositions)

74.   Incident report by Pavlick dated 8/6/99 (previously marked P-23B in depositions)

75.   Incident report by Traver dated 8/16/99 (previously marked P-40 in depositions)


The remainder of the exhibits were filed today electronically. If you have any questions, please contact attorney Rosado at 215-625-0551. Thank you for your attention to this matter.

Sincerely,

Marsha Levick, Esq.
Lourdes Rosado, Esq.
ATTORNEYS FOR PLAINTIFF


Enclosures

2

Ex. 61 to
Pl.'s Resp. to Defs.'
Summ. J. Mot.

U.S. DISTRICT CO

DISTRICT OF PENNSYLVANIA

\* \* \* \* \* \* \* \*

A          M          , \*

    Plaintiff          \*   Case No.

    vs.          \*   3:CVR-01-1276

LUZERNE COUNTY          \*

DETENTION CENTER,  \*

    Defendant          \*

    \* \* \* \* \* \* \* \*

DEPOSITION OF

JEROME PRAWDSIK

August 20, 2002

FILED
SCRANTON

APR 1 1 2003

PER
DEPUTY CLERK

COPY

Any reproduction of this transcript
is prohibited without authorization
by the certifying agency.

Sargent's Court Reporting Service, Inc.
(814) 536-8908



14

1    then to the parents.

2    Q.      If the child needed to be

3    disciplined, was that discipline

4    carried out by the child care

5    workers?

6    A.      They would write an incident

7    report and that would go through me

8    and then through the chief.

9    Q.      And what was your role in the

10   path of that incident report?

11   A.      I would give it to the chief.

12   Q.      And what would the chief do?

13   And by chief I assume you mean the

14   chief probation officer?

15   A.      Yes.

16   Q.      What would the chief do with

17   that incident report?

18   A.      Decide what should be done.

19   Q.      So is it fair to characterize

20   your role when you were hired in 1978

21   as just an administrator of the

22   detention center?  And if you don't

23   understand what I mean I'll explain

24   that.

25   A.      If you could.

1  became a requirement.

2  Q.      Do you recall when that was?

3  A.      A few years ago.  I don't know

4  exactly when.

5  Q.      By the way, today you report

6  to Mr. Kwarcinski; is that correct?

7  A.      Yes.

8  Q.      And you have reported to him

9  directly, do you recall, for how

10  long?

11  A.      Since the '80s.  I don't know

12  exactly when.

13  Q.      Okay.  But sometime since the

14  '80s?

15  A.      Yes.

16  Q.      Do you still consider yourself

17  a court employee?

18  A.      Yes.

19  Q.      When you undergo training,

20  this annual training of 40 hours a

21  year, first of all, how is that

22  training set up?  Do you schedule the

23  training yourself or is it scheduled

24  for you?

25  A.      Well, it's scheduled, but we

31

1    first, have you taken that course?

2    A.      Yes.

3    Q.      Okay.  And again, that would

4    not be a required course, that would

5    be a course that you would elect to

6    take; is that correct?

7    A.      Yes.

8    Q.      And what do you recall about

9    that course, the subject matter and

10   content?

11   A.      Just talk to them.  You've got

12   to deal with them, watch them, look

13   for signs, have them seen by crisis

14   when necessary.

15   Q.      What's your understanding of

16   when it would be appropriate to call

17   in crisis?

18   A.      Just by their actions and

19   behavior, you know, suicidal.

20   Q.      And their attitude and

21   behavior, such as ---?

22   A.      It's hard to say, you know.

23   Q.      Well, let me ask you this

24   question.  You supervise the child

25   care workers; correct?

1   A.      Yes.

2   Q.      And the child care workers; is

3   it fair to say, have the most amount

4   of contact with the children in the

5   center?

6   A.      Yes.

7   Q.      That's correct?

8   A.      Yes.

9   Q.      Do you have meetings with

10  child care workers where you discuss

11  how to deal, for example, with

12  children who have mental health

13  problems in the center?

14  A.      If there's a person that's

15  coming in who has a mental health

16  problem, we ---.

17  Q.      What would you say to the

18  child care staff about that child?

19  A.      We'll have to keep a special

20  watch on that person.

21  Q.      And what does that mean by

22  special watch?

23  A.      Well, during the evening he

24  would be put on a suicide watch and

25  someone would be with him for the

33

1   evening, you know, outside his door,

2   watching, on a suicide watch,

3   monitoring him.

4   Q.      Any other special instructions

5   that you would give the child care

6   staff?

7   A.      That would be it.

8   Q.      That would be it, just a

9   suicide watch.  Have you been offered

10  courses in types of children who are

11  particularly vulnerable in a

12  detention or correctional setting who

13  are most likely, perhaps, to be

14  victimized by the children?

15  A.      Not that I recall.

16  Q.      And you don't recall taking

17  any courses in that either?

18  A.      No.

19  Q.      Other than post-traumatic

20  stress disorder and what sounds like

21  --- and correct me if I'm wrong --- a

22  general mental health juvenile

23  justice course, have you been offered

24  any other courses that looked at

25  other specific kinds of mental health

34

1    disorders?

2    A.      Not really.

3    Q.      No.  And you haven't taken any

4    courses?

5    A.      No.

6    Q.      What about courses involving

7    de-escalating conflicts between

8    children?  Have you taken courses in

9    that?

10   A.      No.

11   Q.      Have you been offered any

12   courses in that; do you recall?

13   A.      I can't recall.

14   Q.      You've described this safe

15   physical management, which I

16   understand you to say refers really

17   to physical restraint; is that

18   correct?

19   A.      Yes, that's it.

20   Q.      Is that also chemical or

21   mechanical restraints?

22   A.      No.  No chemical, no

23   mechanical.

24   Q.      So physical is really just

25   your --- a worker's strength?  You're

52

1    that?  Is there anything in the

2    manual that speaks to that?

3    A.      I don't know.

4    Q.      You don't know.  If two

5    residents are fighting with each

6    other, is there anything in the

7    manual that provides guidance or sets

8    up a protocol for how to deal with

9    that?

10   A.      They would be restrained and

11   the supervisor would be made aware of

12   it.

13   Q.      Is that in the manual?  Is

14   that in writing in the manual?

15   A.      If it's not in the manual,

16   it's in the --- we have a memo --- a

17   book, also, of memos and they are,

18   you know, directed to the personnel,

19   as to what's expected of them.  And

20   those manuals are kept up in both

21   quarters, too.  And it would be in

22   there, if not.

23   Q.      Okay.  Let me make sure I

24   understand you.  What you're saying

25   is that there are memos that are

1   A.      Yes.

2   Q.      And you have a binder for the

3   year 2002?

4   A.      Yes.

5   Q.      What happens to the binders

6   for '99, '98, '97?  What happens to

7   them?

8   A.      I don't think we had that back

9   then, where we had binders, to be

10  quite honest with you.  It's

11  something new that we ---.

12  Q.      Okay.  Well, you've been at

13  the detention center a long time, so

14  you don't recall having these binders

15  prior to the year of 2000?

16  A.      No, we just started it.  Yes.

17  That's a new procedure.

18  Q.      What was the procedure prior

19  to 2000?

20  A.      Well, memos were issued, but

21  they didn't --- they were filed.

22  Q.      Where would they have been

23  filed?

24  A.      Just in --- in the '99

25  material.

1   A.      Yeah, like a tray.

2   Q.      A tray?

3   A.      Yes, where you can put things

4   in it.

5   Q.      Where were the trays

6   maintained?

7   A.      In the dayroom.

8   Q.      Was this the upstairs dayroom

9   or the downstairs dayroom?

10  A.      Downstairs dayroom.  Each one

11  has their name on it, you know.

12  Q.      Is that how it's done today?

13  A.      Yes.

14  Q.      I see.  But it's not ---?

15  A.      I don't know if it started in

16  '99 or not.  I'm not sure.

17  Q.      Okay.  Now, let's go back to

18  the policies and procedures manual.

19  You've testified, I believe, that

20  there was no written protocol in the

21  policies and procedures manual for

22  dealing, for example, with a child

23  who is being victimized at the

24  detention center?

25  A.      Not that I recall.

60

1    Q.      And I believe you testified,

2    and this is how we got into the

3    discussion of memos, that you don't

4    recall that there was a written

5    protocol for dealing with two

6    children who were fighting with each

7    other, in the policies and procedures

8    manual; is that correct?

9    A.      Yes.

10   Q.      Do you recall whether or not

11   there was a written protocol in the

12   policy and procedures manual for

13   dealing with children who were sex

14   offenders who came into the facility?

15   A.      Well, if it was a known sex

16   offender, they would keep like a

17   special watch on them.

18   Q.      And who decided to keep a

19   special watch on them?

20   A.      Myself, Mr. Kwarcinski or Mr.

21   Doran.

22   Q.      Was this policy at the

23   detention center?

24   A.      It was our policy, if they

25   were, you know, sex offenders, to

1    who are sex offenders?

2    A.      No.

3    Q.      And how do you communicate to

4    the staff that a child is a sex

5    offender?

6    A.      Verbally and sometimes

7    written.

8    Q.      I missed the end of your

9    sentence.

10   A.      Verbally or through a memo.

11   Q.      Or through a memo?

12   A.      Yes.

13   Q.      Now, when A t     M .

14   came to the detention center in the

15   summer of '99, did you consider him

16   to be a sex offender?

17   A.      I'm not a --- I mean --- I

18   don't remember.

19   Q.      You don't remember whether he

20   was or wasn't?

21   A.      No, I didn't.

22   Q.      Do you recall any specific

23   meetings about A             ?

24   A.      No.

25   Q.      Do you recall learning about

79

1   Q.      Well, how does the nurse know

2   to keep this material locked?

3   A.      She's instructed.  She's told

4   to.

5   Q.      By who?

6   A.      By management.

7   Q.      Again, management being

8   yourself?

9   A.      Yes.

10  Q.      Would Mr. Kwarcinski instruct

11  her to that effect?

12  A.      Possibly.

13  Q.      Would Ms. Brulo?

14  A.      Possibly.

15  Q.      Is there anything in the

16  policy and procedures manual that

17  instructs her to that effect?

18  A.      I'm not sure.

19  Q.      Now, when the nurse fills out

20  one of these forms with the doctor

21  and she notes, as she did on Exhibit

22  28, eight hospitalizations for

23  behavior and then three additional

24  hospitalizations for behavior noted

25  under that, what would she be

1  the log.

2  Q.      Let me ask you something about

3  --- some questions about keeping

4  track of the population.  Is there

5  anything in the policy and procedures

6  manual that, in writing, speaks to

7  knowing where the population is at

8  all times?

9  A.      Yes.

10  Q.      Yes?

11  A.      They're always with a child

12  care worker.  At no point in time are

13  they left without a child care

14  worker.  So they're with them at all

15  times.

16  Q.      The population is with the

17  child care worker at all times?

18  A.      Yes.

19  Q.      Okay.  What about keeping

20  track of the comings and goings of

21  the children?  How do you keep track

22  of that?

23  A.      When they're released or ---?

24  Q.      Within the facility.  If they

25  go to a meal or they go out for

92

1    A.      No.

2    Q.      You don't recall any unusual

3    meetings involving child care workers

4    at the detention center management to

5    talk about him?

6    A.      No.

7    Q.      You don't recall any

8    discussions about whether an outside

9    mental health consultant should be

10   called to help staff deal with

11   M       ?

12   A.      No.

13   Q.      Do you recall a memo

14   instructing that A       M       be

15   placed on the girls' side for the

16   majority of the time?

17   A.      No.

18   Q.      Do you recall seeing this memo

19   before today?

20   A.      I can't say I've seen it.   I

21   can't really recall, you know, three

22   years ago, but I ---.

23   Q.      Do you recall what date, what

24   weeks you were on vacation that

25   summer?

93

1    A.        I have it written down.

2    Q.        Okay.

3    A.        From 7/17 to 8/2.

4    Q.        So you were on vacation on the

5    date that this memo was written;

6    correct?

7    A.        Yes.

8    Q.        What would your practice have

9    been when you returned from vacation?

10    A.        When I looked at everything

11    that was in my mailbox, I would see

12    that this would've been in there.

13    Q.        But you don't recall actually

14    going and talking to Mr. Kwarcinski

15    about the content of the memo; is

16    that correct?

17    A.        No.  But he was in girls'

18    quarters during this time.  That's --

19    -.

20    Q.        What would you understand the

21    majority of his time to be, by the

22    way, since this obviously would have

23    been carried forward and there would

24    have been instruction to you when you

25    came back from vacation.  What did

1   that mean to you?

2   A.      You mean what did that ---?

3   Q.      Majority of his time?

4   A.      Awake hours he was with the

5   girls.

6   Q.      So awakening, pretty much from

7   breakfast until after dinner?

8   A.      Yes, until they go to bed.

9   Q.      And I assume, based on your

10  prior testimony, it's fair to say

11  that that would be noted in the log?

12  A.      Yes.

13  Q.      As to comings and goings?  And

14  by that I mean if he went to the

15  girls' unit after breakfast on August

16  1st, it should have been in the log;

17  correct?

18  A.      It should have been, yes.

19  Q.      And if he came back after

20  dinner it should have been in the

21  log; correct?

22  A.      Yes.

23  Q.      There's a reference in this

24  memo that A        should be reminded

25  not to discuss the nature of his

1    charges with the other children.  Do

2    you recall anything about that being

3    an issue, why that would be in the

4    memo?

5    A.      No.

6    Q.      Did you interview and make

7    recommendations with regard to the

8    hiring of child care staff?

9    A.      Recommendations on hiring?

10   Q.      Yes.  I know I probably said

11   that in the past tense.  Do you

12   interview candidates for the position

13   of child care worker?

14   A.      I might sit in on an

15   interview, but I, you know, ---.

16   Q.      It's not your primary

17   responsibility?

18   A.      No.

19   Q.      Whose primary responsibility

20   is it to do the interviewing?

21   A.      Chief, deputy chief.

22   Q.      Chief of probation?

23   A.      No, the deputy chief.

24   Q.      Or the deputy chief, which

25   would be Mr. Kwarcinski?

1    A.      Yes.

2    Q.      Why would they do the

3    interviewing when these people

4    actually report directly to you?  Why

5    was it set up that way?

6    A.      I have no idea.

7    Q.      Is it fair to say then that

8    your involvement in interviewing is

9    ---?

10   A.      Minimal.

11   Q.      Minimal.  Okay.  And

12   definitely not part of your job

13   requirements or responsibilities?

14   A.      No.

15   Q.      Who decides what staff

16   training the staff are going to

17   undertake?

18   A.      Now?

19   Q.      Well, you can answer the

20   question as to now, yes.

21   A.      Right now they do.

22   Q.      I'm sorry?

23   A.      Themselves.

24   Q.      They decide?

25   A.      Yes.  They have the training,

1  made out and then it's given, right

2  now to either myself or Mr. Doran

3  this point in time.

4  Q.     Right.   What happened in 1999?

5  A.     It would go to Mr. Kwarcinski.

6  Q.     The incident report?

7  A.     Yes.

8  Q.     So a copy was put in the

9  child's file in 1999; is that

10  correct?

11  A.     Mr. Kwarcinski would get it,

12  review it, and then it would go back

13  and be put in his file.

14  Q.     So the procedure in 1999 is

15  that actually the copy went to Mr.

16  Kwarcinski first?

17  A.     Uh-huh (yes).

18  Q.     And you were not necessarily

19  in that loop at all?

20  A.     Well, Mr. Kwarcinski would

21  tell me, would I care to look at it?

22  Q.     Every incident report?

23  A.     Almost, I couldn't say

24  definitely every.

25  Q.     Well, you didn't have an

102

1  expectation that every incident

2  report would be shared with you; is

3  that correct?

4  A.     Quite possibly.  It didn't

5  really involve me.

6  Q.     As the detention supervisor in

7  1999 and the only detention

8  supervisor in 1999, what incident

9  would not involve you?  What kind of

10 an incident report would not involve

11 you?

12 A.     Well, something if an incident

13 was made up --- say a person, you

14 know, for instance, a phone call.  If

15 he would, instead of calling, making

16 a phone call to his mother, and here

17 the phone number wasn't exactly his

18 mother's, and it was, you know --- he

19 called somebody else like a

20 girlfriend or whatever

21 take, for instance, you know, that

22 would be directed to Mr. Kwarcinski.

23 He would you know, deal with that.

24 Q.     What would Mr. Kwarcinski do

25 with that information?

1   Q.     Were child care workers

2  instructed to make notes at these

3  shift change meetings?

4  A.     No.

5  Q.     And is it your impression, or

6  to your knowledge, in fact, that they

7  didn't make notes?

8  A.     Yes.  They didn't?

9  Q.     They did not make notes.

10  A.     Yes.

11  Q.     Okay.  When new workers came

12  to the detention center, they

13  underwent an orientation; is that

14  correct?

15  A.     Yes.

16  Q.     And were you responsible for

17  conducting that orientation?

18  A.     Mr. Kwarcinski would, and

19  myself, sit down with them for a day

20  and go over everything.

21  Q.     Both of you together; is that

22  correct?

23  A.     Not necessarily.  One might do

24  it and not the other.

25  Q.     I'm going to ask you to take a

111

1   look at Plaintiff's Exhibit 12.  Do

2   you recognize the document?

3   A.     Yes.

4   Q.     And is this the orientation

5   schedule that was in use?

6   A.     As soon as they start.

7   Q.     Was this in use in 1999?

8   A.     Yes.

9   Q.     Has it changed, to your

10  knowledge?

11  A.     No.

12  Q.     So this was a one-day event;

13  is that correct?

14  A.     Uh-huh (yes).

15  Q.     And you would go over each

16  item on here over the course of the

17  day?

18  A.     Yes.

19  Q.     Okay.  Was this the first day

20  of work?  How did you go about doing

21  this?  Did they do it before they

22  actually reported to work?

23  A.     No, first day of work.

24  Q.     First day at work.  Is this

25  when they would be given a copy of

118

1    employees?

2    A.      Yes.

3    Q.      Anything in addition to that

4    handed to them in ---.

5    A.      No.

6    Q.      So most of this orientation

7    would actually be done verbally by

8    either you or Mr. Kwarcinski or both

9    of you; is that correct?

10   A.      Uh-huh (yes).

11   Q.      I may have asked you this.

12   I'm sorry.  I don't remember.  Did

13   you review the log every day?

14   A.      Excuse me?

15   Q.      Did you review the log every

16   day?

17   A.      No.

18   Q.      When would you review it, or

19   under what circumstances would you

20   review it?

21   A.      If an incident took place and

22   I wanted to read about it.

23   Q.      So you would have to have

24   heard about something from either a

25   child care worker or Mr. Kwarcinski

1  or Ms. Brulo in order for you to

2  decide to review the log on your own;

3  is that correct?

4  A.      Yes.

5  Q.      But you wouldn't do it as a

6  matter of your routine job

7  responsibility?

8  A.      No.

9  Q.      Is there a census?  And what I

10  mean by that, on any given day do you

11  have a list of who's in the detention

12  center?

13  A.      Every morning they do a

14  morning report of what's going on.

15  And it requires a list of this - - -.

16  Q.      Who's there that day?

17  A.      Yes.

18  Q.      Do you do an evening report to

19  the extent that kids have come in or

20  have been released?

21  A.      Morning report.

22  Q.      Only a morning report?

23  A.      Yes.

24  Q.      And if kids have come and gone

25  during the day, meaning just released

1   respect to A          staying at the

2   detention center?

3   A.      No.

4   Q.      This is something that you

5   would expect to be brought to your

6   attention though; is that correct?

7   A.      Yes.

8   Q.      And ---?

9   A.      I can't recall.  That's what I

10  mean.

11  Q.      Okay.  You don't recall it but

12  you'd expect it to brought to your

13  attention, yes?

14  A.      Yes.

15  Q.      And would you expect Mr.

16  Kwarcinski to bring it to your

17  attention or a child care worker?

18  A.      Mr. Kwarcinski.

19  Q.      Would you be responsible

20  for --- to the extent there's some

21  issue obviously about staff placement

22  in the detention center, or who's

23  with A          at a given time, is this

24  a decision that you would make as a

25  supervisor to the child care workers?

1  A.      Mr. Kwarcinski.

2  Q.      Mr. Kwarcinski would make it?

3  A.      Uh-huh (yes).

4  Q.      Why would he make it rather

5  than you?

6  A.      He's a deputy chief, you know,

7  and he made that decision.

8  Q.      But what about the actual

9  assigning of the child care workers

10  to sit with A        for the next

11  hour.  Who would make that decision?

12  Would you make that decision, or Mr.

13  Kwarcinski?

14  A.      Mr. Kwarcinski.

15  Q.      Even though setting up shifts

16  is your job?

17  A.      Scheduling, yes.

18  Q.      Scheduling is your job.  But

19  something like this would be Mr.

20  Kwarcinski's job to take whatever

21  schedule you set up and to tinker

22  with it with respect to supervising

23  Anthony?

24  A.      Including people who were

25  scheduled for that shift anyway.

1  Q.      Well, I'm trying to understand

2  that this appears to direct that

3  A        is in the detention center,

4  certainly, on this date, that he is

5  to be separated.  And you've

6  described separated as being

7  essentially one on one with the child

8  care worker at all times; is that

9  correct?

10 A.      That he would be with you at

11 all times is vital, yes.

12 Q.      And by himself; correct?

13 Separated means not with the general

14 population.

15 A.      Separated we're in this room

16 here, population might be sitting

17 here (indicating).  You'd be sitting

18 over here with me, separated from the

19 population.

20 Q.      Okay.  So my question is

21 whether or not some specific

22 designation of --- if there are two

23 child care workers on that day

24 supervising that population, would

25 Mr. Kwarcinski or would you decide

1  Q.      Is there any other type of

2  special medical or mental health

3  assistance that they might seek for a

4  child where they wouldn't first

5  contact you or Mr. Kwarcinski or Ms.

6  Brulo in your absence?

7  A.      No.

8  Q.      None?  So any special

9  attention that a child needed above

10 and beyond routine supervision would

11 require clearance from you or Mr.

12 Kwarcinski or Ms. Brulo; is that

13 correct?

14 A.      Yes.

15 Q.      Do you ever remember meeting

16 A.      M       ' mother or

17 stepfather during the time he was in

18 detention?

19 A.      No.

20 Q.      Do you recall receiving any

21 telephone calls from them?

22 A.      No.

23 Q.      Do you have any recollection

24 of ever having a conversation with

25 A.      M          ?